McDONALD et al., *Appellants*, v. QUICK et al.

### Division One, June 8, 1897.

Land Titles: DEED OF TRUSTEE AND LIFE-TENANT: EMPTOR CAVEAT. An owner of land conveyed it to a trustee in trust for the separate use of a wife with the power to sell the same upon written instructions from the wife under seal at any time during *the life of her husband,* but if not so sold and if his death preceded hers, to go to their bodily heirs. She and her husband, who had been duly appointed trustee, executed a mortgage to secure the payment of notes made by him. After his death, she and the duly appointed succeeding trustee conveyed the property by warranty deeds to the grantor of plaintiff, the purchaser assuming the payment of said mortgage, which he paid; and he and his grantees, under succeeding warranty deeds, had been in peaceable possession for over twenty years before they discovered that the title was in the remaindermen, their excuse being that the trustee, being a highly reputed examiner of titles, and the wife assured the purchaser that the title was perfect in them. All the deeds were of record. These plaintiffs ask that the original mortgage be revived and that the release thereof be set aside and that they be substituted as *cestuis que trust.* *Held,* that no representation of the trustee and life-tenant, whether made for a fraudulent purpose or from a mistake as to the legal effect of the trust deed, could effect the estate of the remaindermen. *Held,* also, that as the mortgage was made to secure the individual debt of the trustee, and not being made for the benefit of the estate, neither a purchaser of the mortgage nor a purchaser at a sale under a foreclosure proceeding could have been subrogated to the rights of the remaindermen, for such purchaser would only succeed to the husband's rights as trustee. *Held,* also, that though the trustee and the wife may have been mistaken as to the extent of the title in them, such fact conferred no equitable title on the purchaser or his successive grantees. *Held,* also, if plaintiffs bought the title relying on the abstracts for their evidence of title and thereby were induced to pay for something they did not obtain, they could look to the abstracters for damages, or resort to the warranty made in their grantor's deed.

*Appeal from St. Louis City Circuit Court.*—HON. JOHN M. WOOD, Judge.

AFFIRMED.

*Webster & Webster* for appellants.

(1). Breckenridge was entitled to be subrogated to the rights of the mortgagee, having paid off the incumbrance, which was a charge on the estate, under the belief that he had the title thereto. *Cobb v. Dyer,* 69 Maine, 494; *Wood v. Smith,* 51 Iowa, 156; *Young v. Morgan,* 89 Ill. 199; *Brewer v. Nash,* 16 R. I. 458; *Dillow v. Warpel,* 71 Iowa, 106; *Valle v. Fleming,* 29 Mo. 152. Even though it might, in a certain sense, be called a mistake of law. *Griffith v. Townlee,* 69 Mo. 13; *Lawrence v. Beaubien,* 2 Bailey, 623. (2) This right of subrogation in Breckenridge passed to his grantee, and from him to plaintiffs by the, conveyance of the property. *Logan v. Taylor,* 20 Iowa, 297; *Fisher v. Johnson,* 5 Ind. 492; *Given v. Carroll,* 18 S. E. Rep. 1030; *Shroyer v. Nickell,* 55 Mo. 264; *Kinneas v. Lowell,* 34 Maine, 299; *Allen v. Kennedy,* 91 Mo. 324. (3) The fact that Breckenridge and plaintiffs may be said to have had constructive notice of the state of the title by record will not preclude the relief prayed for. *Cobb v. Dyer,* 69 Maine, 494; *Spencer v. Spencer,* 3 Jones Eq. (N. C.) 404; *Converse v. Blumrich,* 14 Mich. 109. (4) Plaintiffs have the right to charge the land with the amount Breckenridge paid in satisfaction of the mortgage, and the sums they and their grantors paid for taxes, improvements, etc,, and credit it with the rents and profits, and are entitled to a lien on it for the amount of the excess of debits over credits. *Shroyer v. Nickell,* 55 Mo. 264; *Sims v. Gray,* 66 Mo. 614.

*Everett W. Pattison* and *C. H. Coggeshall* for respondents.

(1) The relief sought by plaintiffs, if the right thereto ever existed, is barred by limitation, and the

laches of plaintiffs. (2) The persons who satisfied the deed of trust are not complaining nor seeking any relief. (3) There can be no relief on the ground of mistake. The Breckenridges purchased with full notice of the state of the title. *Tydings v. Pitcher*, 82 Mo. 379; *Meier v. Blume*, 80 Mo. 179; *Orrick v. Durham*, 79 Mo. 174; *Major v. Bukley*, 51 Mo. 227; *Patterson v. Booth*, 103 Mo. 402; *Oliver v. Piatt*, 3 How. (U. S.) 333, 410; *McPherson v. Rollins*, 107 N. Y. 316. (4) The facts do not present a case falling within the equitable doctrine of subrogation. *Foote v. Sanders*, 72 Mo. 616; *Kleimann v. Geiselmann*, 114 Mo. 437; *Anglade v. St. Avit*, 67 Mo. 434; *Bunn v. Lindsay*, 95 Mo. 250; *Goodyear v. Goodyear*, 72 Iowa, 329; *Caley v. Morgan*, 114 Ind. 350. (5) The case of *Valle v. Fleming*, *supra*, and like cases, have no application. *Henry v. McKerlie*, 78 Mo. 416; *Burden v. Johnson*, 81 Mo. 318; *Price v. Estill*, 87 Mo. 378.

BRACE, J.—On the first day of May, 1860, one Oliver Quinette, being then the owner of the lot of ground in the city of St. Louis described in the petition, by his deed of that date conveyed the same, in consideration of the sum of $18,312.76, to Henry W. Williams, his successors and assigns, *in trust* for the following purposes:

"*First.* In trust for the sole and separate use, benefit, enjoyment and behoof of Mary Eliza Miles, wife of Stephen W. Miles, Jr., during the term of her natural life, and entirely free from all control, restraint or interference whatsoever on the part of her husband, the said Stephen W. Miles, Jr., the said Mary Eliza Miles to have, hold, use, occupy, and enjoy the exclusive and undisturbed possession of said tract of land and its appurtenances during the term of her natural life, as aforesaid, with full power, at any time

during the lifetime of her husband, Stephen W. Miles, Jr., but not after his death, to direct the sale, leasing, incumbrance, or other disposition thereof by said party of the second part, and his successors in trust, at her will and pleasure. Also to receive to her own separate use and benefit the proceeds of such sale or incumbrance, and all rents and profits arising or accruing from the leasing or other disposal thereof; the said party of the second part, or his successors in trust, holding said tract of land subject at all times, during the lifetime of said Stephen W. Miles, Jr., to the direction in writing under the hand and seal, and without the intervention of her husband, of said Mary Eliza Miles, as to the disposal of said lot of ground and its appurtenances, whether by lease, deed of incumbrance, conveyance in fee absolute, assignment, or transfer of said trust, or otherwise.

"*Second.* In the event of the death of the said Mary Eliza Miles, the said Stephen W. Miles, Jr., her surviving, said party of the second part, or his successors in trust, to hold said property to the use, benefit and behoof of said Stephen W. Miles, Jr., during the term of his natural life, in the same manner as is above provided, and subject at all times to the direction, in writing, of said Stephen W. Miles, Jr., as to the disposal of said lot in any manner whatsoever, whether by lease, deed of incumbrance, conveyance in fee absolute, assignment, or transfer of trust, or otherwise.

"*Third.* If after the death of said Mary Eliza Miles and said Stephen W. Miles, Jr., said property remain undisposed of by them, said party of the second part, and his successors, to hold said tract of land and its appurtenances to the use, benefit and behoof of the children then living, born of the marriage between said Stephen W. Miles, Jr., and

Mary Eliza Miles, in equal proportions, share and share alike, and if any children born of said marriage should then be dead, leaving issue, said issue to be entitled to the share which said child would have been entitled to if living.

"*Fourth.* In the event of the death of said Stephen W. Miles, Jr., and of all the children born of said marriage, without issue, said Mary Eliza Miles surviving, said party of the second part or his successors in trust, to convey said tract of land and its appurtenances in fee simple to whomsoever the said Mary Eliza Miles should by her last will and testament direct, and in default of such will, to convey the same in fee simple to the heirs at law of said Stephen W. Miles, Jr.

"*Fifth.* In the event of the death of said Mary Eliza. Miles, and of all the children born of said marriage without issue, said Stephen W. Miles, Jr., then surviving, said party of the second part, or his successors in trust, to convey said tract of land and its appurtenances in fee simple to said Stephen W. Miles, Jr., or to whomsoever he might in writing direct."

By further provision of the deed, power is given to the said Mary Eliza Miles and Stephen W. Miles, Jr., each, or either of them, whenever they, or either of them, shall have cause, or deem it necessary or advisable, to appoint a trustee in place of the said Williams, in the manner therein specified. By virtue of such power, the husband, Stephen W. Miles, Jr., was on the sixteenth of September, 1867, duly substituted as trustee in place of said Williams, and afterward, to wit, on the first day of September, 1869, the said Stephen W., as such trustee, by the written request and direction of his wife, executed a deed of trust on the property to secure the payment of four notes of the said Stephen W., of even date therewith, aggregating

$12,000, and interest thereon from date at the rate of ten per cent per annum; the principal payable five years after date, and interest notes payable semi-annually.

In April, 1872, Stephen W. Miles, Jr., died, and upon the third of July, 1872, upon the petition of his widow, the said Mary E., the said Henry W. Williams was appointed by the St. Louis circuit court trustee instead of the said Stephen W., whose death was recited in the decree; and afterward, to wit, on the fifteenth of September, 1873, Mrs. Miles and Williams, as trustee, in consideration of the sum of .$17,000, conveyed the property to George Breckenridge in trust for the sole and separate use of his wife, Julia. Mrs. Miles joined in the deed as grantor, describing herself therein as the "widow of Stephen W. Miles, deceased," and with the trustee warranting the title. The conveyance to the Breckenridges was made subject to the deed of trust aforesaid which was assumed as a part of the consideration money; was executed and acknowledged also by them, and contained the following covenant on their part: "And said parties of the second and third parts for themselves, their heirs, executors, and administrators, do by their signatures and seals to this instrument covenant and agree to and with the said Mary E. Miles that they will pay and take up said notes as they severally mature and become due and payable and deliver the same to said Mary E. Miles to be canceled; the property hereby conveyed to remain mortgaged and pledged to secure the faithful performance of this covenant." The Breckenridges took possession of the property immediately after their purchase, paid off the notes secured by the deed of trust on the twenty-third of December, 1874 (when satisfaction thereof was acknowledged by the assignees of the *cestui que trust* and the property released by them upon

the margin of the record thereof), and remained in in the undisturbed possession of the property until the twenty-seventh of August, 1881, when by their warranty deed of that date they sold and conveyed the same to James M. Pierce for the consideration of $14,000, who on the fifteenth day of September, 1881, by warranty deed of that date sold and conveyed the property to Benjamin F. Webster for the consideration of $15,000, who on the first day of July, 1882, by his warranty deed of that date sold and conveyed the property to the plaintiffs for the consideration of $9,500, subject to a deed of trust to secure a principal note for $6,000 and five unpaid interest notes of $180 each. Each of these purchasers, in their order, succeeded to the possession of the Breckenridges, and the plaintiffs and their grantors have, ever since the Breckenridge purchase in 1873, remained in the undisturbed possession of the premises.

On the twentieth of January, 1894, the plaintiffs instituted this suit in the circuit court of the city of St. Louis against the said Mary E. Miles, now Mary E. Quick, and Mary L. Warnock, Horine Miles, Stephen A. Miles, Edward Miles and Leonora N. Miles, children of the said Mary E. by the said Stephen W., deceased, and Edna Ditch, a grandchild, alleging in their petition, in substance, that at the time of the execution of the deed by Mrs. Miles, and the trustee Williams, of September 15, 1873, to the Breckenridges, the Breckenridges believed that the fee to the premises was conveyed to them by the deed; that under such belief they purchased the property, paid off the notes secured by the deed of trust and caused the same to be released; that such belief was induced by the representations of Mrs. Miles and the said Williams, acting at the time as her agent, and upon which they relied. That the repre-

sentations made by Mrs. Miles and Williams were
either fraudulently made in order to deceive the
Breckenridges, or as the result of a mutual mistake of
law and fact. That by reason of the premises the
Breckenridges acquired equities which have passed
to the plaintiffs; that they and their grantors until
within six months of the institution of this suit, had
no notice of any claim of title adverse to their own,
and no reason to suspect that the title in fee was not con-
veyed by the deed to the Breckenridges, and that plaintiff
first learned within six months next before the institu-
tion of this suit that Stephen W. Miles, Jr., died in
April, 1872, and that Mrs. Miles' power to direct a
conveyance ceased on his death. That they have paid
the taxes and made valuable improvements on the
premises; and praying that the release of the deed of
trust be set aside, and that the same be declared a lien
on the property for the amount of the notes and inter-
est secured thereby, in favor of the plaintiffs; that
such amount be ascertained together with the costs of
the improvements made by plaintiffs, and the taxes
paid by them on the property, and that defendants be
required to pay the same to plaintiffs, or in default
thereof that the property be sold and out of the pro-
ceeds thereof. the costs and expenses of the sale be first
paid, then to plaintiffs the amount due on said notes,
then to them the amounts expended in improvements
and for taxes as aforesaid; and in the event that sub-
rogation be denied, that the sale to Breckenridge be
set aside, an account be taken of the rents and profits
and of the moneys paid for taxes and improvements by
plaintiffs, and their grantors; and that defendants be
required to pay plaintiffs, as assignee of George and
Julia Breckenridge, within a time to be fixed by the
court, the sum of $17,000 with the interest paid by
the Breckenridges in satisfaction of said deed of trust,

the amounts expended by plaintiffs and their grantors for taxes and improvements, less the value of the rents and profits; that upon such payment, plaintiffs be required to convey to defendants all their interest in the property, and in default thereof the property be sold and the proceeds distributed as above.    Issue was joined by answer of Mrs. Quick, and the separate answer of the other defendants.    To support the action the plaintiff introduced the following parol evidence:

*George Breckenridge* testified on behalf of plaintiff as follows:

"I have lived in St. Louis about 38 years, know Mrs. Quick and knew Williams for 38 years.    In 1873 I was looking for a country place, and made inquiry from Williams, who told me he had a nice place.    I looked at the place, and went back to see Williams, and had a talk with him.    He said Mrs. Miles was in debt, and it had to be sold to pay taxes on it, unpaid interest and other claims, and asked me to make an offer.    I offered $17,000, and that was all it was worth.    Out of that money I paid some of these claims.    Mrs. Miles was there when I did it, and Williams was there as her agent.    I paid the balance, about $4,200 to Williams for Mrs. Miles.    Williams was to look up the title and see if it was clear.    She said she wanted the notes for $12,000, when I paid them, so she could prove them against her husband's estate.    The $12,000 was borrowed and invested in land in Illinois for her husband, and as this property was hers, she wanted to file a claim against the estate on the notes."

Here a receipt was identified by the witness and offered in evidence for plaintiffs.    It read as follows:

"ST. LOUIS, MO., April 5th, 1876.

"I have received from Mr. George Breckenridge twelve notes made by Stephen W. Miles to order of Jules M. Delisle, dated Sept. 1st, 1869, described as

follows: 1 note at 5 years for $3,000; 1 note at 5 years for $3,000; 1 note at 5 years for $3,000; 1 note at 5 years for $3,000; 4 notes at 54 months each for $150; 4 notes at 60 months each for $150. All of which notes have been fully paid by said George Breckenridge according to his agreement with Mrs. Mary E. Miles, and the same are now placed in my hands for the purpose of enabling said Mary E. Miles to claim payment thereof from the estate of Stephen W. Miles, and when that is accomplished said notes are to be returned to Mr. Breckenridge to be canceled.

"(Signed)      HENRY W. WILLIAMS."

The witness continued: "The transaction was closed up in Williams' office; he, Mrs. Miles and a notary were present. Mrs. Miles stated she had a clear title, and that the notes should be preserved so she could prove them up. So far as selling a life interest only, I never heard of such a thing. Mr. Williams, who was then considered the very best in town, furnished the examination of title. I paid all the notes and had them satisfied on the record twenty years before I discovered the true state of the title. I relied in purchasing entirely on the title examiner."

On cross-examination the witness said: "I went to Williams because I considered him the best in town then. I did not know Mr. Webster then; not till some time after. I have known him as a title examiner for twenty years. Williams gave me a document showing the title—don't remember how much I paid for it, but it was whatever he charged. I took possession after I bought the property, and held it about eight years. Mr. McDonald has lived there for ten years past. Mrs. Miles said she wanted to turn the notes over to Mr. Williams, her agent, to prove against her husband's estate at Waterloo. She said the $12,000 due on the place was invested in Illinois lands in his name, and

she wanted to prove that amount against his estate; he owed her that amount. After deducting the claims I paid the rest of the purchase money—laid it on the table—but don't know which got it. I read over the deed I got, and then recorded it.''

On re-direct examination he said: ''I held peaceable possession—never heard of any adverse claim. I bought the property outright—no life estate. Mrs. Miles said Williams was her agent and transacted her business for her.''

*Gabriel C. McDonald,* one of the plaintiffs, gave evidence as follows:

''I bought this property thirteen or fourteen years ago; gave $14,000. I had abstracts of title made. I got one from Webster, Benjamin F.; it was from the title company; one from Williams & Tittman, and one from Wachtel. I gave these abstracts to Father Abler, who was here from Milwaukee, figuring on buying the place, about two years ago; Gehner afterward examined the title and said it was all right. Father Abler had further search made and then it was found Mrs. Quick had no right to the property. That was the first I heard of it; that was in October, 1893.''

Witness here identified a certificate of Williams & Tittman continued by August Gehner & Company, showing the title to be good, which was admitted in evidence. The witness continued:

''I looked among my papers for the others, but couldn't find them, but surely would if I had them. I sent two men to Milwaukee to find them, but couldn't. I never heard of any adverse claim until the latter part of 1893; since then I have talked with Mrs. Quick about it; I told her what the trouble was, and she said she had sold the property in good faith, and believed she had a right to do it, and would see me righted. She gave me the names of all her children, and said

none would give me trouble but one, and told me the trouble she had with this one. She said she would write me immediately. Williams' name was mentioned; that he had done the business for her."

On cross-examination the witness testified: "We are now in possession; when we bought we got a certificate from the St. Louis Title Co. I don't know what Mr. Webster had to do with it. It was given to me by a man named Flanagan. I bought the property from Hewitt & Flanagan, who were all I knew in it until I got the deed. Wr. Webster was the grantor in it. I didn't know Mr. Webster at the time I bought the property; had never seen him. He never gave me any information about the title; did not give me any certificate. I don't know whether he was connected with the office that gave me the abstract or not, nor whether it was signed by him."

Plaintiffs then read the deposition of the defendant, *Mrs. Mary E. Quick*, who testified as follows:

"I am the widow of Stephen W. Miles, Jr., and reside at Kimmswick, Missouri. In 1873 I lived in Illinois. Mr. Ditch, my son-in-law, and Mr. Williams did all the business connected with the sale to Breckenridge. I took no part in it at all. I had no conversation with him about it. I don't know what business Mr. Williams was in; in examining titles I believe. I never went to his office. Mr. Williams always handled Mr. Miles' money—they were great friends. After Mr. Miles' death I continued to reside in Illinois; Mr. Ditch and Mr. Williams attended to the business in the city. Williams did not consult me about the sale of the property to Breckenridge. No one spoke to him about it but Mr. Ditch. I don't remember how much Mr. Breckenridge paid for it. At that time there was an incumbrance on it which was to be taken out of the sale—the notes were to be paid. Mr. Ditch is dead

now. I did not pay any of the notes myself. I don't know what the proceeds of the notes were used for. Mr. Ditch brought the deed to me to be signed. I remember Mr. McDonald coming to see me about this matter at my home at Kimmswick. I can't tell what was said, it was so unexpected. That was the first time I heard of the defect. I told him it seemed wrong to have a man pay for something and lose it, but there was no such intention on my part, I never did anything out of the way. I don't remember just where I signed the deed to Breckenridge—it was not in Mr. Williams' office though. I don't remember who was there, nor any conversation that took place.''

The defendants then introduced evidence showing that Benjamin F. Webster was a lawyer whose specialty was title examining and his reputation as such of the best; that he was connected with the title company with which Flanagan was connected, and that the decree of the third of April, 1872, appointing Williams trustee, was duly recorded in the office of the recorder of deeds. Upon the case thus made, the court rendered a decree dismissing plaintiffs' bill without prejudice, from which they prosecute this appeal.

The foregoing extended statement of this case has been made in view of the peculiarity of its circumstances, of the situation of the parties, and of the relief sought, and in order that the consideration of the grounds upon which such relief is demanded may, to some extent, be abbreviated.

The plaintiffs are in the peaceable and undisturbed possession of the premises, under full covenants of warranty, and when this suit was begun, they and their grantors had been so in possession for more than twenty years. When they bought the land and accepted Webster's deed for it in 1882, the title to the premises was spread on the public records, importing

notice to them and to the world of the exact condition of that title, and what that condition had been ever since the Quinette deed was recorded in 1860.    It appears clearly from the evidence that they bought the premises upon the faith of the recorded title as manifested to them by abstracts prepared by gentlemen engaged in the business of examining titles, in whose skill they had confidence, and whom they employed for that purpose.    They paid the purchase money relying for evidence of title upon the abstracts· furnished by these gentlemen, and the warranty of their grantors to whom they paid it; and if they failed to get such a title as they expected, had a right to expect, and paid for, it would seem that to these persons, who have brought them into their present predicament, plaintiffs should look for indemnity for any damages they may suffer by reason of their failure to discharge the duty which they owed to the plaintiffs, or continue to rely for indemnity upon the warranty contained in the deed of their grantor.    But this course they are unwilling to pursue, and with their possession of the premises undisturbed and not even threatened, they invoke the aid of a court of equity.    The substance of their plea for such interposition being, that as the deed of trust given to secure the debt of Stephen W. Miles, Jr., was a lien upon the premises, and was paid off and discharged by Breckenridge as a part of the consideration paid by him for the title he received from the trustee Williams, and Mrs. Quick, he, Breckenridge, thereby became entitled to be subrogated to the right of the mortgagee therein as though he were an assignee thereof, and to foreclose the same as though it never had been paid off; and this right having been transmitted to plaintiffs through and by the several *mesne* conveyances before mentioned, they are entitled to ask such foreclosure at the hands of a court of equity.

VOL. 139 mo—32

This is a long call upon the powers of a court of equity, a parallel to which we have not found in any adjudicated case, and we hardly think it can be sustained.

It is to be remembered that the plaintiffs and all those under whom they claim have from the beginning been dealing with a trust estate, limited and defined by deed duly spread upon the public records, in which the estate vested or to be vested in all of its grantees and beneficiaries is distinctly specified and defined, as well as the powers to be exercised by any one to whom any power is therein granted. It is well settled law in this State that "a purchaser of land is charged with constructive notice of everything contained or recited in the recorded deeds which lie in and constitute the chain of title under which he holds." *Patterson v. Booth*, 103 Mo. 402; *Tydings v. Pitcher*, 82 Mo. 379; *Orrick v. Durham*, 79 Mo. 174; and it is equally well settled that "one who acquires property with notice either actual or constructive that his grantor holds title as trustee, stands in his grantor's shoes and holds the property charged with the trust." 27 Am. and Eng. Ency. of Law, 252.

The plaintiffs, in order to have any claim for equitable relief, ask to be substituted to the place of Breckenridge and would stand in Breckenridge's shoes. Conceding, for the sake of argument, that this may be done, the next question is, in whose shoes was Breckenridge standing? So far as his grantor, Mrs. Quick, is concerned, he was standing in his own. But as against her, he needs no equitable relief; whatever interest she had in the premises, passed by her deed (*Foote v. Sanders*, 72 Mo. 616); and she and her interest may be dismissed from further consideration with the passing remark that nothing she did or said or could have done or said, beyond the power conferred upon her by the deed of Quinette, could in any way

affect the estate of the remaindermen, against whom relief is really sought. So far as their estate is concerned, Breckenridge, by his purchase of the legal title from the trustee stood in the shoes of the trustee, and held the property subject to the trust. The office of trustee is one, by however many different persons it may be successively filled; and for the sake of brevity Stephen W. Miles, Jr., and his successor Williams may be considered as one—*the trustee*—in whose shoes Breckenridge stood by his purchase and acceptance of the legal title.

By virtue of the appointment of Mrs. Quick under the power vested in her, the trustee had legally incumbered the estate, *not for its benefit*, but to secure the individual indebtedness of the trustee. Suppose Stephen W. Miles, Jr., the trustee, had paid off this individual indebtedness of his own, and then had come into a court of equity and asked to be subrogated to the rights of the mortgagee and to have the indebtedness perpetuated as a charge against the estate of the remaindermen, can it be doubted for a moment, but that the court would have either turned a deaf ear to such a plaint, or if it returned an answer, that the answer would have been: "You have simply discharged your own indebtedness and have no claim upon the remaindermen, who have never received any benefit therefrom?" How, then, can one who stands in his shoes and has done this thing for him, have any greater hold upon the conscience of a court of equity than he would have had to enforce such a claim? And such is the position of Breckenridge and the plaintiffs when this substitution and subrogation business is pushed to its last extremity.

There is, however, nothing in the facts of the case that would entitle Breckenridge to subrogation to the rights of the creditor in the deed of trust executed by

Miles trustee, according to the well settled principles upon that subject. Sheldon on Subrogation, sec. 3; 24 Am. and Eng. Ency. of Law, 281, and cases cited in note 2; *Kleimann v. Gieselmann*, 114 Mo. 437; s. c., 45 Mo. App. 497; *Bunn v. Lindsay*, 95 Mo. 250; *Norton v. Highleyman*, 88 Mo. 621; *Price v. Courtney*, 87 Mo. 387; *Anglade v. St. Avit*, 67 Mo. 434. With the title of the trustee and of Mrs. Quick spread before him on the record, and in the deed which he accepted, disclosing every fact by which that title could be affected, without any interest in the property to be protected, he voluntarily assumed and paid off the incumbrance as a part of the consideration for the conveyance which they made to him, and which he was willing to accept and did accept without any agreement, express or implied, and we may say without a thought even on his part that the incumbrance was to be kept alive for any purpose. He was willing to accept the deed and pay off the incumbrance, and did so for the title which the trustee and Mrs. Quick could and did make him. That he or they may have been mistaken as to the value or extent of that title in no way changes the complexion of the transaction, or confers any equitable rights upon him or the plaintiff claiming through him. It is but justice to the parties, however, to say that there is no evidence of any fraud in the case, and if there was any mistake, it was a mistake in construing the deed; a mistake in law, and not of fact. Even had there been mistake or fraud upon the part of Mrs. Quick or Williams, we do not see how the estate of the remaindermen, who were not parties to it, could be affected thereby.

Nor do we see how the facts of this case bring the plaintiffs within the equitable principles laid down in the case of *Valle v. Fleming*, 29 Mo. 152, and the cases following it, for the protection of a defendant in

possession of premises against an action in ejectment by the holder of the legal title. It will be time enough, however, to inquire whether they can be protected under those principles, when the necessity for invoking them arises.

As the case now stands, they are the holders of the legal title, are in peaceable possession of the premises; their possession is not threatened. The children of Mrs. Quick by Stephen W. Miles have no vested interest in the property; they are but contingent remainder-men in equity, and may never acquire a vested interest. Should the time ever come, however, when they do, and they undertake to assert their interest, then it will be time, soon enough upon the facts that may then be presented, to inquire whether the plaintiffs can excuse themselves from executing in favor of these remaindermen the trust which they have voluntarily assumed, upon the principles laid down in the case of *Valle v. Fleming, supra*, or upon any other equitable principle. Their bill was dismissed by the circuit court without prejudice, and it seems to us that this was a proper disposition of the case under the existing circumstances. The judgment is therefore affirmed.

All concur.